UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TAYLOR ELLIS, | § § | |
| Plaintiff | § § | CAUSE OF ACTION: |
| v. | § § | 1:22-cv-315 |
| CITY OF AUSTIN, | § § | |
| Defendant. | § § | |
| | § § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff TAYLOR ELLIS brings this 42 U.S.C. § 1983 case against the City of Austin

for the excessive force inflicted on him as he was exercising his free speech and assembly rights

and demonstrating against police violence.

## I. PARTIES

1. Plaintiff Taylor Ellis is a resident of Travis County, Texas.

2. Defendant City of Austin is a municipality that operates the Austin Police Department

and may be served through its City Clerk at 301 W. 2nd Street, Austin, TX 78701. The City's

policymaker for policing matters was former Police Chief Brian Manley at the time of the

incident and is currently Chief Joseph Chacon.

## II. JURISDICTION AND VENUE

3. This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action pursuant to

28 U.S.C. §§ 1331 and 1343.

4. This Court has general personal jurisdiction over Defendants as they reside and/or work

in Travis County, Texas.

5. This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct by Defendants that injured Plaintiff Taylor Ellis, and which occurred in Travis County, Texas, which is within the Western District of Texas.

6. Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Travis County, which is within the Western District of Texas.

### III. FACTS

7. Following the police killings of George Floyd in Minneapolis and Mike Ramos in Austin, demonstrators organized protests against police brutality outside the headquarters of the Austin Police Department on May 30, 2020 and May 31, 2020.

8. Plaintiff Taylor Ellis attended the demonstration to support the peaceful demonstrations against police violence and racial injustice.

9. During the protest on May 31, 2020, Ellis was one of many protesters demonstrating in the area between APD headquarters and IH-35 proper.

10. At approximately 3:25pm, Ellis walked with the crowd of protesters on to IH-35 proper.

11. Just minutes later, APD officers began to fire less lethal rounds into the crowd without any apparent justification.

12. At approximately 3:29pm, Ellis was walking peacefully with his hands in the air north on the IH-35 southbound lane, near the median.

13. Video evidence shows that Ellis was doing absolutely nothing remotely threatening to any protester or officer around him.

14. Still, APD Officers Todd Gilbertson and Officer Michael Crossen fired less lethal shotguns at Ellis without any apparent justification.

15. APD Officer Gilbertson and Crossen hit Ellis twice with less lethal beanbag rounds, once in the left shoulder and once in the left hip.

16. Ellis fell immediately to the ground.

17. Other protesters immediately surrounded Ellis to come to his aid.

18. Despite seeing him fall to the ground and knowing they shot an innocent individual, no APD officer came to help Ellis.

19. As APD officers continued to back off of the highway, numerous officers continued to shoot less lethal shotguns rapidly and without apparent justification into the crowd.

20. Numerous officers were standing alongside Officers Gilbertson and Crossen, but not one interceded to stop them from continuing to fire their less lethal shotguns into the crowd without reason.

21. Upon information and belief, Officers Gilbertson and Crossen, and APD leadership generally, were substantially motivated by their opposition to the demonstrators' message that police violence must end and that Black Lives Matter.

22. The APD officer's attacks on Ellis were shocking, unreasonable, and would chill a person of ordinary firmness from continuing to engage in protected speech and assembly.

23. Tragically, Ellis was just one of many people APD officers shot on May 30 and May 31.

24. In fact, on May 30, 2020, APD overreacted numerous times and used chilling, excessive force on multiple individuals. Among others, APD's victims included Nicole Underwood, Jason Gallagher, Joe Herrera, Levi Ayala, and Bomani Barton.

25. APD Officer John Siegel used unreasonable force against Underwood and has been indicted for aggravated assault by a public servant.

26. When asked to explain why he shot Underwood, APD Officer Siegel pled the Fifth.

27. APD Officer Nicholas Gebhart used unreasonable force against Ayala and has been indicted for aggravated assault by a public servant.

28. The City has agreed to pay Ayala a settlement of $2,950,000.

29. APD Officers John Siegel, Salvador Gonzalez-Galvan, and Bryan McCulloch used unreasonable force against Gallagher.

30. APD Officer James Morgan used unreasonable force against Herrera.

31. APD Officer Kyu An used unreasonable force against Barton.

32. Numerous other officers used unreasonable force on May 30, 2020.

33. Yet APD leadership did nothing to stop APD's continued violence.

34. On the evening of May 30, 2020, Austin Councilmember Greg Casar texted Chief of Police Brian Manley, City Manager Spencer Cronk, Mayor Steve Adler, and other senior officials about the horrific injuries caused by APD officers' use of less lethal shotguns.

35. In fact, Casar specifically told them about the injuries to Ayala and Underwood and begged them to stop APD officers from continuing to shoot innocent protesters.

36. City and APD leadership refused and APD officers continued to shoot less lethal shotguns with abandon on May 31, 2020.

37. One of the many individuals shot on May 31 was Anthony Evans. Evans was hit in the face. Evans was doing nothing wrong before being shot.

38. APD Officer Kyle Felton used unreasonable force against Evans.

39. The City has agreed to pay a settlement to Mr. Evans of $2,000,000.

40. Another of the many individuals APD shot in the head was Justin Howell, a twenty-year-old Black college student who also had done nothing that could possible justify him being shot.

4

41. APD Officer Jeffrey Teng used unreasonable force against Howell and the City has agreed to pay him a settlement of $8,000,000.

42. Teng also has been indicted for aggravated assault by a public servant.

43. And when given the opportunity to explain why he shot Justin, he pled his Fifth Amendment right not to incriminate himself.

44. As Justin lay on the ground unconscious and bleeding, no police officer came to help him. Protesters rushed to help Howell, who lay bleeding from a serious head wound from being shot in the head with a projectile fired by an APD officer.

45. Incredibly, rather than assist those protesters get Justin emergency medical care, an APD officer shot at them.

46. In particular, APD officer Chance Bretches shot a medic with her hands in the air who was trying to get Justin help.

47. Maredith Drake was a street medic that was walking toward police with a red cross on her chest and her hands above her head when she was shot by APD.

48. Drake posed no danger whatsoever to anyone before Bretches shot her.

49. APD Officer Chance Bretches used unreasonable force against Drake.

50. And when asked directly if he intentionally shot Ms. Drake while she posed no danger to anyone, Officer Bretches invoked his Fifth Amendment right not to incriminate himself.

51. And Bretches pled the Fifth to questions concerning his assaults on another citizen in 2019 and whether he also assaulted Arianna Chavez.

52. Upon information and belief, to date, none of the officers who have intentionally shot kinetic projectiles at or near protesters have been disciplined.

53. Nor has the APD and its policymakers disciplined any of the officers who saw and did not stop officers from using unreasonable or conscience shocking force.

54. And APD's leaders, who could have and should have stopped their subordinate officers' dangerous conduct, have not been counseled or disciplined in any way for permitting this misconduct.

55. This lack of discipline as to senior leaders and Manley himself is all the more shocking as then Chief Manley acknowledged that Anthony Evans, Justin Howell, Levi Ayala, and numerous other individuals were victims of unjustifiable force by APD officers on May 30 and May 31, and that such force was not justified by any facts known to the department or any of the shooting officers.

56. Moreover, then APD Chief of Police, Brian Manley, adopted policies that encouraged, authorized, or tolerated this unreasonable, unnecessary, and brutally excessive force even though Chief Manley had long known of the dangers of firing projectiles into crowds and at defenseless persons, and was actually aware that bean bag rounds fired from shotguns had been unreasonably used multiple times on May 30, 2020 and multiple times again on May 31, 2020. Despite this, and Manley's awareness of the severe injuries caused by them, APD policies – and Manley – authorized their continued use.

57. Chief Manley knew, as any reasonable policymaker would also know, that as a direct consequence of such practices, people like Plaintiff would be injured and victimized, and their constitutional rights violated.

58. Moreover, APD had a long-standing policy of paramilitary training – teaching its officers to act as "warriors," and see conflict with members of the public as inevitable as part of an "us vs. them" culture.

59. Officers were trained to be "indifferent to the community," according to a report commissioned by the City.

60. APD's training academy taught cadets – who later became APD officers – to act as if they were at war with the community they were supposed to be protecting. In one incident, an academy instructor told cadets that if "anyone here says they want to be a police officer to 'help people,' I will punch you in the face."

61. Another instructor told cadets to "pick someone out of a crowd, and ask yourself, 'how could I kill that person?'"

62. A report commissioned by the City found that officers were trained to see "the Austin community [as] the enemy."

63. Unsurprisingly, the report further found that "the culture of a police training academy reflects the culture of a department and impacts the mindset and approach to policing." The report concluded that the City must provide "training for handling protests with non-militaristic approaches."

64. As a direct and proximate result, numerous other people suffered severe and devastating injuries as a result of APD's practices and excessive force on May 30, 2020 and May 31, 2020.

65. According to Dell Medical Center's physicians, at least nineteen people required serious medical care for injuries caused by APD's use of less lethal shotguns on May 30, 2020 and May 31, 2020. Seven victims required surgical interventions and four victims retained portions of the "beanbag" shotgun rounds in their bodies/heads.

66. Victims suffered intercranial hemorrhages, depressed skull fractures, depressed frontal bone fracture, fractured jaws, and brain damage.

67. After ignoring the pattern of excessive force that preceded and followed the attack on Cesar for several more days, multiple members of the City Council called for Manley to be removed as APD's Chief of Police.

68. Following the calls to remove him, Chief Manley acknowledged the obvious, the policies at Austin Police Department concerning the use of bean bag shotguns were dangerously flawed and he agreed to change them – a change any reasonable policymaker should have known to have made prior to Plaintiff being shot.

69. No longer would officers be permitted to fire potentially deadly kinetic projectiles from shotguns at people in crowds.

70. Manley, however, did not ban the use of kinetic projectiles in all situations and did not reform the dangerous paramilitary culture of the police academy.

71. Nor did Manley take any steps to discipline, re-train, or terminate any of the officers known to have used excessive force in response to the peaceful May 30 and May 31, 2020 protests.

## IV. CAUSES OF ACTION

### I.    FIRST, FOURTH, AND FOURTEENTH AMENDMENT § 1983 *MONELL* CLAIM

72. Plaintiff incorporates the preceding paragraphs as if alleged herein.

73. APD Officers Crossen and Gilbertson, while acting under color of law, used excessive and conscience shocking force on Taylor Ellis when he posed no danger to anyone.

74. This use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused Plaintiff Ellis to suffer serious injuries. Therefore, Ellis's clearly established right to be free from excessive and conscience shocking force was violated.

75. As a direct and proximate result, Ellis suffered and continues to suffer significant injuries.

76. Likewise, the First Amendment's protections for free speech and assembly prohibit agents of the government from subjecting an individual, like Ellis, to retaliation for engaging in protected speech.

77. Ellis exercised his free speech and assembly rights by attending the demonstration against police violence, and by demonstrating near officers.

78. Upon information and belief, APD Officers Crossen and Gilbertson's use of force against Ellis was substantially motivated by his disagreement with the content of Ellis's speech. Upon information and belief, the officers shot Ellis with the beanbag shotgun substantially because the officers disagreed with APD Officers Crossen and Gilbertson right to assemble and/or his protected speech.

79. Moreover, Defendant City of Austin, had the following policies, practices, or customs in place when APD Officers Crossen and Gilbertson, acting under color of law, injured Plaintiff Ellis and violated his rights under the Constitution:

   a. Shooting kinetic projectiles into crowds where people could be injured;

   b. Shooting people who posed no danger to anyone with kinetic projectiles;

   c. Using, authorizing, and/or tolerating excessive force against non-violent protestors;

   d. Failing to adequately discipline officers;

   e. Failing to adequately supervise officers;

   f. Failing to adequately train officers concerning de-escalation of force, crowd control, use of force against non-violent protestors, and the use or misuse of kinetic projectiles

   g. Retaliating against protesters;

h. Failing to train officers regarding demonstrators' free speech and assembly rights;

i. Not intervening to stop constitutional violations, including but not limited to retaliation, conduct that shocks the conscience, and excessive force;

j. Training officers to act as paramilitary "warriors," and creating an "us vs. them" culture where officers were "at war" with the community they were supposed to be serving, which encouraged officers to use excessive force; and

k. Failing to train or instruct officers about specific incidents it considers unreasonable, excessive force, or in violation of the Constitution.

80. Each of the policies, practices, or customs delineated above was actually known, constructively known, and/or ratified by City of Austin and then Chief of Police, Brian Manley (APD's policymaker), and was promulgated with deliberate indifference to Ellis's First, Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Austin Police Department officers would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

81. Moreover, then Chief Manley was also aware of multiple similar incidents chilling speech and in which unconscionable, excessive, or unreasonable force was used but he did not remedy the misconduct. Thus, the City is also directly liable for Chief Manley's failure to train, supervise, and correct misconduct, which proximately caused Plaintiff to suffer injuries and have his rights violated.

82. Consequently, the policies delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages.

83. Plaintiff Ellis brings this claim pursuant to 42 U.S.C. § 1983.

**V. DAMAGES**

84. Plaintiff Ellis seeks the following damages:

    a.  Past and future medical expenses;

    b.  Past and future economic damages, including (but not limited to) loss of earning capacity;

    c.  Past and future physical pain and mental anguish;

    d.  Past and future impairment;

    e.  Past and future disfigurement; and,

    f.  Attorneys' fees pursuant to 42 U.S.C. § 1988.

**VI. PRAYER FOR RELIEF**

85. To right this injustice, Plaintiff requests the Court:

    a.  Award compensatory damages against Defendant;

    b.  Award Plaintiff costs and fees, including but not limited to expert fees and attorneys' fees, pursuant to 42 U.S.C. § 1988;

    c.  Award pre-judgment and post-judgment interest at the highest rate allowable under the law; and,

    d.  Award and grant such other just relief as the Court deems proper.

Dated: April 4, 2022

Respectfully submitted,

**EDWARDS LAW**
603 W 17th St.
Austin, Texas 78701
Tel.  512-623-7727
Fax.  512-623-7729

By _____ /s/ Jeff Edwards _____
       JEFF EDWARDS
       State Bar No. 24014406
       jeff@edwards-law.com
       DAVID JAMES
       State Bar No. 24092572
       david@edwards-law.com
       PAUL SAMUEL
       State Bar No. 24124463
       paul@edwards-law.com


**ATTORNEYS FOR PLAINTIFF**